# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:03-CV-237-PRC |
| | ) | |
| U.S. BELL, LINK TECHNOLOGIES, | ) | |
| CORP., d/b/a U.S. BELL, and BUZZ | ) | |
| TELECOM CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 142], filed by

Defendants, U.S. Bell Corporation, Link Technologies, Corp. d/b/a U.S. Bell, and Buzz Telecom

Corp. (collectively "U.S. Bell") on March 30, 2005.  For the following reasons, U.S. Bell's Motion

for Summary Judgment is granted in part and denied in part.

## PROCEDURAL BACKGROUND

The Plaintiff, Equal Employment Opportunity Commission ("EEOC"), filed a Complaint

against U.S. Bell on June 16, 2003.  In the Complaint, the EEOC alleges violations of Title VII of

the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991.  The EEOC alleges that

Tiffany Sims, Beatrice Johnson, Renee Roby, and a class of similarly situated employees were

subjected to a hostile work environment and quid pro quo sexual harassment, that U.S. Bell forced

Roby and a class of similarly situated employees to resign their employment, and that Sims, Johnson,

Childs, Roby, and a class of similarly situated employees were demoted and/or terminated in

retaliation for their opposition to the unlawful practices and/or their participation in statutorily protected activity. The EEOC seeks to correct these alleged unlawful employment practices of U.S. Bell and its successor entities on the bases of sex and retaliation and to provide appropriate relief to Sims, Johnson, Roby, Childs, and a class of similarly situated employees who were adversely affected by the alleged practices. Specifically, the EEOC seeks compensatory damages, punitive damages, and injunctive relief against the Defendants.

U.S. Bell filed an Answer on July 16, 2003, denying the material allegations of the Complaint.

On October 10, 2003, a Motion to Intervene was filed by Joshua Childs, Tiffany Sims Childs ("Sims"), Beatrice Johnson, and Renee Roby. The Motion to Intervene was granted on November 7, 2003, and a Complaint by the Intervenor Plaintiffs was filed that same day. The Intervenor Complaint was brought against the U.S. Bell Defendants as well as Defendants Kurtis Kintzel ("Kurtis"), individually and in his corporate capacity, Keanan Kintzel ("Keanan"), individually and in his corporate capacity, and Gene Chill, individually and in his corporate capacity (collectively "Individual Defendants").

On December 23, 2003, U.S. Bell and the Individual Defendants filed an Answer to the Intervenor Complaint.

On March 30, 2005, U.S. Bell filed a Motion for Summary Judgment. The EEOC filed its Brief in Opposition to the Motion for Summary Judgment on May 2, 2005. A Reply Brief in Support of the Motion for Summary Judgment was filed on May 31, 2005, by U.S. Bell.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate-in fact, is mandated-where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe. Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Id.* at

325.  When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.* at 323, 325; *Green v. Whiteco Indus., Inc*., 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1526 (7th Cir. 1990).  However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists.  *Kaszuk v. Bakery & Confectionary Union & Indus., Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings.  Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).  Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party.  *NLFC, Inc. v. Devcom Mid-Am., Inc*., 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  A court's role is not to evaluate the weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the matter, but

instead to determine whether there is a genuine issue of triable fact. *Anderson*, 447 U.S. at 249-50; *Doe*, 42 F.3d at 443.

No heightened standard of summary judgment exists in employment discrimination cases nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Srvcs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility are critical issues, frequently found in employment cases, which are genuinely contestable. *Id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown, or for that matter, rare, in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## FACTUAL BACKGROUND

The facts viewed in the light most favorable to the non-moving party, the EEOC, are as follows. U.S. Bell, a telecommunication business, is owned and operated by Kurtis and Keanan Kintzel. A small portion of U.S. Bell is owned by Rob Dimitt who is not involved with the daily operations of the business. The business was started in 1992 and became known as U.S. Bell Corporation; although the name was later changed to Buzz Telecom ("Buzz").[1] Kurtis, who owns seventy-two percent of Buzz's stock, is the Chairman of the Board and President of Buzz. Keanan owns twenty-six percent of Buzz's stock and holds the positions of secretary and treasurer of Buzz. Bill Brzycki was the Vice President of Administration and Ethics Officer at Buzz; his responsibilities included overseeing all aspects of Buzz's sexual harassment policy and employee complaints. Kelly Adwell Cripe was the Division 1 Manager at Buzz, oversaw hiring and ethics, was responsible for

---

[1] Due to licensing concerns regarding the use of the name "Bell," the company changed its name to Link Technologies Corp. d/b/a U.S. Bell in the spring of 2002. The name of the company was then changed to Buzz Telecom.

conducting exit interviews, and reported to Brzycki. Investigation of sexual harassment claims fell mainly on Cripe and Brzycki. Cripe oversaw hiring and ethics and was responsible for conducting exit interviews.

In November 2000, Brzycki, along with the company attorney, wrote Buzz's sexual harassment policy. Though he wrote the policy, Brzycki cannot remember ever explaining the sexual harassment policy to anyone. Brzycki stated that he did not have much experience when dealing with claims of sexual harassment. Cripe personally read and signed a sexual harassment policy on her first day of work. Most employees were unaware a sexual harassment policy existed. The EEOC policy letter was shown to Margaret Robertson-Smith, Buzz's Director of Communications, when she was first hired, but it was not posted anywhere in the building as it was kept in the reception desk filing cabinet. Robertson-Smith remembers having to sign a company policy when she was hired; however, she did not receive any sexual harassment training, as she described that it "was pretty much a free fall over there." Pl. Br., Exh. 26, p. 13 (Robertson-Smith Dep.). An employee, Tiffany Sims, noted in her EEOC charge of discrimination that to her knowledge, U.S. Bell did not have a sexual harassment policy nor was one ever communicated to her. Employees Renee Roby and Beatrice Johnson denied any knowledge of a sexual harassment policy. Also, employee Iesha Cotton does not remember being given any paperwork regarding sexual harassment.

In 2000, Michael Norvil was hired by Buzz as a telemarketer. On October 12, 2000, Norvil drafted a memo that was added to his personnel file and that stipulated that his two prior employment positions had ended because of charges of sexual harassment and fraternization with other employees. Norvil stated that Buzz did not provide any sexual harassment training during his employment. In October 2000, Norvil was promoted to the position of Vice President of Expansion

at Buzz. This position involved overseeing all of the telemarketers, who were predominately female. All of the telemarketers worked in one large open room together at rows of tables.[2] The work force of telemarketers was transient as employees came and went quickly and U.S. Bell was frequently hiring.[3]

At some point after being hired, Norvil signed an "Executive Employment Agreement," which stipulated that "inter-office" relations were forbidden. Pl. Br., Exh. 19, p. 31-32 (Norvil Dep. Volume I). Relations were defined as "flirting, kissing, touching, etc." *Id*. While in his supervisory position as Vice President of Expansion, Norvil admits violating the "Executive Employment Agreement" by having relations with several of his employees. Pl. Br., Exh. 19, p. 35 (Norvil Dep., vol. I). These violations included kissing Hilary Phillips, Amber Mink, Jennifer Turner, Stephanie Rodriguez, Kelly Hendle, Yanira Daniels, Melissa Grissom, and Andrea Boscovich. Norvil also had consensual relationships with three individual female employees. Norvil had sexual relations during lunchtime with another employee, Daniels, in a closet at the back of the sales floor. Daniels and Norvil both went into the closet to have sexual intercourse. They did not have sexual intercourse, but did engage in half-naked groping and kissing. Norvil also admits that he had sexual intercourse with an employee, Grissom, in the closet during work hours.

Roby, an employee, asserts that Norvil exposed his penis to her at work. Sometime prior to May 9, 2002, when Roby filed her charge with the EEOC, Roby had complained to Kurtis about Norvil's behavior, especially the incident where he exposed his penis in front of her, and Kurtis

---

[2] The telemarketers' work environment was similar to a classroom with rows of tables without any partitions between the work stations.

[3] Lisa Hogan noted that Buzz had about twenty telemarketers at one time and that "people came and went all the time." D. Br., Exh. 17, p. 24 (Hogan Dep.).

responded, "Are you sure he wasn't just tucking in his pants?"  P. Br., Exh. B-2.  Further, Norvil demanded that Roby perform oral sex, attempted to rub her breasts, and requested that she expose her breasts to him.[4]  Norvil told Johnson that Roby conducted oral sex on him in the break room and that Rasheeda Maxwell did the same to keep her job.  In addition, Norvil wondered out loud to Johnson "how good a mixed girl could suck dick, knowing that [Johnson was] of black and Mexican origin."  Pl. Br., Exh. C1, p. 1.

Norvil also had sexual intercourse with employees outside of the workplace.  These encounters did not remain outside of the office because Norvil repeatedly bragged about and discussed these encounters with his employees and co-workers in the workplace.  Elena Magana remembers that it was common knowledge that Norvil was having sexual relations with the female telemarketers.  For example, after a sexual encounter with Rodriguez at his home, Norvil told other employees that Rodriguez was scared after he "got her naked and when she saw how big" his penis was.  Pl. Br., Exh. 23, p. 12 (Norvil Dep. vol. II).

Comments about sex and sexual jokes were repeatedly made several times a day by Norvil to and in the presence of other employees, and it was common knowledge that Norvil made sexual comments to the female employees.  These comments included making statements on the sales floor about the size of his penis and his desire to get "laid."  Pl. Br., Exh. 18, p. 76 (Magana Dep.).  Cotton mentioned that she was frequently told unwelcome jokes about sex.  In addition to the sexual jokes and comments, Norvil was overheard calling the female employees: "dirty, skank, whore, slut, and Bs."  Pl. Br., Exh. 11, p. 30-1 (Cotton Dep.).  These comments included telling one female employee,

---

[4] During a meeting with Kurtis, Norvil claimed this was a consensual sexual interlude.  However, as the Court must view the facts in the light most favorable to the non-moving party, the Court will consider the conduct non-consensual for the purposes of ruling on the Motion for Summary Judgment.

"You look like a slut today." Pl. Br., Exh. 8, p. 50. (Bernard Dep.). During work hours, Norvil often expressed his desire to have sexual intercourse with other employees.

Along with the sexual comments, Norvil repeatedly made remarks about the clothes worn by the female employees. For instance, if a woman wore an article of clothing that revealed her cleavage, Norvil would say "I see something I like." *Id*. Sims asserts that Norvil told her at work that he wanted to have sex with her and that he poured water down the front of her shirt. Norvil also told Daniels, when she was bent down to pick up something on the floor, "Oh, you could have stayed down there." Pl. Br., Exh. 13, p. 24. (Daniels Dep.). Norvil was overheard by Lisa Hogan, a telemarketer at Buzz, commenting on women's clothing, underwear, and breasts. Pl. Br., Exh. 14, p. 37 (Hogan Dep.). She noted that he would often remark upon women's panty lines and say, "I would like to have sex with her," when speaking about other employees. *Id*. Amanda Bernard once overheard Norvil loudly tell another female employee, Hogan, to "tuck her tit back in her shirt because it was popping out." Pl. Br., Exh. 8, p. 49 (Bernard Dep.). Bernard noted that Hogan seemed angry and uncomfortable about the comment. Johnson was told by Norvil that he could tell who she was by looking at her butt. Norvil often observed job candidates at U.S. Bell and told Kelly Cripe to hire the attractive ones. If the employee did not go along with the comments, Norvil would be unpleasant to the employee for the rest of the day. Norvil's comments about how women looked, which he made almost every day, would make the female employees uncomfortable.

Norvil also often rubbed female employees' shoulders while they were working. For instance, both Serveria Scott and Magana saw Norvil frequently rub the shoulders of fellow female employees. Magana and Scott were subjected to it themselves. This conduct made Magana uncomfortable, which she conveyed to Norvil with a "funny look," and later she told him "you had

no right touching me." Pl. Br., Exh. 18, p. 13 (Magana Dep.). Other employees would complain about Norvil rubbing their shoulders. Norvil would only rub the shoulders of female employees. Another employee, Cotton, remembers an occasion when Norvil touched her neck and she told him "would you please not do that." Pl. Br., Exh. 11, p.38 (Cotton Dep.).

In addition to shoulder rubbing, Norvil frequently tipped female employees' chairs so that he could look down their shirts and watch their breasts jiggle. This occurred to Lisa Lacefield who stated that Norvil would target female employees who wore low neck lines so "if he tipped her back he could look right down her shirt." Pl. Br., Exh. 17, p. 53 (Lacefield Dep.). She also testified that the chair tipping occurred several times a week. If there was a new employee, Norvil would tip her chair and the women would know "that's Mike's next victim. You know, that's the girl he's going to try to talk to or get in her pants." *Id*. at 60. Johnson was subjected to Norvil looking down the front of her shirt while "covering his penis as if he was turned on." Pl. Br., Exh. C-1, p. 1. She was also often pushed and bumped into by Norvil while he felt her breasts "as if it were an accident." *Id*. Norvil hugged the female employees while the women just stood there in front of all the other employees. On one occasion, Norvil took Roby's hand and preceded to kiss and suck on her fingers.

In addition to the sexual activities, sexual comments, and shoulder rubbing, Norvil repeatedly asked the female employees for dates. Norvil often asked female employees for other female employees' personal phone numbers in order to call them for dates. Hogan recounted a time when Norvil requested that she help get another female employee interested in him. If Hogan made good comments about Norvil to the employee, then he would give Hogan good leads on customers that would lead to higher commissions or he would allow her to leave early. Norvil asked out Katrina Reillo and Magana, who both refused his requests. In fact, Reillo complained to her co-workers that

10

she did not like Norvil's requests for dates. Magana went even further and complained to Keanan about Norvil's behavior around November and December of 2002. Scott commented that she felt it was inappropriate of Norvil to ask employees out on dates, given his position with the company. Bernard was also asked out by Norvil on several occasions. On one such occasion, during Bernard's employee evaluation with Norvil, Norvil told her that "the reason I didn't write you up is because I like you" and then asked for a date and her phone number. Pl. Br., Exh. 8, p. 55 (Bernard Dep.).

Norvil solicited sex from employees, including Sims and Roby. In Sims' EEOC charge of discrimination, she asserts that, on January 17, 2002, Norvil indicated to Sims that he wanted to have sex with her. Norvil told Sims that if her fiancee had not been working that day that Norvil and she "would have ended up fucking." Pl. Br., Exh. A1, p. 2. In addition to the solicitation of sex, Norvil also told Sims's co-workers that "he could fuck [her] anytime he wanted." *Id*. At another time, Norvil indicated to Waushara Person that "I'm going to get it," which she understood to mean that Norvil was "going to have sex with [her] one day." Pl. Br., Exh. 24, p. 36-7 (Person Dep.). Johnson was also propositioned by Norvil when he asked her to participate in a threesome.

As Buzz's Vice-President of Expansion, Norvil was in charge of overseeing the sales department, including telemarketers. Even though Norvil claims he only could recommend termination, employees heard on several occasions from Norvil that he could fire employees for any reason. Robertson-Smith, Buzz's Director of Communications, testified that Norvil had the authority to fire anyone he wanted who worked on the sales floor. Also, Cotton remembered Norvil firing one female employee while calling her a "dirty B." Pl. Br., Exh. 11, p. 31 (Cotton Dep.). Norvil could write up employees for infractions, and he often did so. Scott observed that unfair and unwarranted write-ups were made because the employee was female. As a result, Norvil could and often did

intimidate, frighten, and threaten his employees. In fact, based on his comments, Hogan was aware that "it would be immediate termination if we complained over his head." Pl. Br., Exh. 14, p. 45 (Hogan Dep.). Roby stated in her EEOC Charge that Norvil frequently mentioned that he had the power to do whatever he wanted so long as the sales numbers were up. Magana heard Norvil say that employees needed to go along with him to keep their jobs. Cotton commented that, if the employees went behind Norvil's back "and told somebody something that he told you, you were fired. If you stood up for yourself, you [were] fired. If you talked back to him or embarrassed him in front of everyone else, you [were] fired." Pl. Br., Exh. 11, p. 38 (Cotton Dep.). Norvil made it clear to the female employees that they had to go along with his wishes if they did not want to be terminated. Norvil once told his employees that, "if anyone has a problem with me make a report, give it to Cathy Olive, then Cathy will give it to me, I'll laugh, I'll tear it up and you'll be fired." Pl. Br., Exh. 18, p. 81 (Magana Dep.).

Cripe remembers that Norvil "was known to have a temper and lots of sexual advances towards women." Pl. Br., Exh. 24, p. 95 (Cripe Dep.). As a result of her position, Cripe often heard complaints from women who worked for Norvil on the sales floor, which included complaints that he made the female employees uncomfortable and that they did not like when he touched them. In addition, the female employees were afraid of Norvil because "they thought if they didn't let him do certain things to them that he would fire them, or he would come down hard on them." Pl. Br., Exh. 11, p. 94-5 (Cripe Dep.). Robertson-Smith observed that Norvil was "very forceful and flirtatious." Pl. Br., Exh. 26, p. 20 (Robertson-Smith Dep.). When new female employees were hired, they were often warned by Cripe, Robertson-Smith, and Brzycki to stay away from Norvil.

The indiscretions and actions of Norvil at Buzz Telecom began to be known by the management and supervisors of Buzz during the summer of 2001. In May 2001, there were complaints about Norvil's activities. On May 24, 2001, Jaci Erwin resigned from her position and wrote a report stating, "I resigned because of the continuing harassment from Division 6a manager Mike [Norvil]." Pl. Br., Exh. 21, p. 58-60 (Norvil Dep. vol. 1, Exh. 10).[5] Cripe testified that she first heard complaints in the summer of 2001 and that she forwarded all complaints to Brzycki. In a July 25, 2001 memo, Keanan refers to a meeting with Norvil to discuss "Mike's recent inter-divisional dating activities." *Id*. at 82-83. On September 12, 2001, Phillips stated on her "Employment Status Form," which each employee filled out at the termination of employement, that "Mike Norvil approached me several times and asked me 'out.' I told him no on all occasions, but he still persisted." Pl. Br., Exh. 19, p. 60-67 (Norvil Dep., vol. 1, Exh. 11). In her "Employee Status Form," dated October 22, 2001, Cassandra Mardis Idisr states that she could have "filed sexual harassment charges against Norvil." Pl. Br., Exh. 19, p. 75, Dep. Exh. 11 (Norvil Dep., vol. 1). Further, during her exit interview on September 12, 2001, Lacefield reported Norvil's conduct, including the chair tipping, to Brzycki. Lacefield also told Keanan about Norvil's behavior. When asked by Keanan why she did not complain earlier, she told him that she believed she would have been terminated if she had. Keanan denied this and told Lacefield he needed to be notified if there was a problem.

Sims contacted Cripe on January 25, 2002, to meet with her on January 28, 2002, in order to report Norvil's sexual harassment. On January 28, 2002, Norvil fired Sims before she met with Cripe. However, Sims met with Cripe after she was terminated. After one month, Sims was rehired

---

[5] Normal procedure for an exit interview included a termination sheet ("Employee Status Form") written out by the employee's direct supervisor and then a meeting with Cripe to discuss the termination. If there was no termination sheet, the employees could meet with Cripe at any time to discuss their resignation. Cripe did not make the termination decision as it was left to the department manager.

on the condition that she not work on Norvil's shift and that Norvil not be her direct supervisor. Subsequently, Norvil was again on her shift and her direct supervisor. When Cripe received the sexual harassment complaint from Sims, she passed the report on to Brzycki, who Cripe states did not take it seriously. Upon receiving it, Brzycki commented that Norvil would not have hit on Sims "because [she] was overweight and unattractive." *Id.* at 141. According to Cripe, Sims' report was never followed up by either her or Brzycki, although she admits that Kurtis did take action after learning of Sims' complaint.

Brzycki noted that there were a total of ten complaints made by exiting employees and that he noted them to Keanan, then placed the reports in Norvil's personnel file. According to Robertson-Smith, there were at least four complaints about Norvil. Norvil was not disciplined nor was any investigation done based on these reports from employees. Brzycki noted that Norvil was given "a lot of breaks" because he did well at his job and was producing sales. Pl. Br., Exh. 10**,** p.124 (Brzycki Dep.). Both Brzycki and Keanan warned Norvil against this type of behavior.

On April 26, 2002, Sims, a telemarketer, filed a Charge of Discrimination with the EEOC on the basis of sex and retaliation, and on May 28, 2002, Sims filed an Amended Charge for the purpose of adding Kurtis and Keanan as named respondents, alleging that they sought to terminate her employment in retaliation for the prior charge filed with the EEOC. On April 29, 2002, Roby filed a Charge of Discrimination with the EEOC on the basis of sex and retaliation, and on June 10, 2002, Roby filed an Amended Charge on the basis of sex and retaliation related to her treatment after she filed her original Charge. On May 8, 2002, Johnson, a telemarketer, filed a Charge of Discrimination with the EEOC on the basis of race and sex, and on June 7, 2002, Johnson filed an Amended Charge,

alleging discrimination on the basis of race, sex, and retaliation. On December 9, 2002, Person filed a Charge of Discrimination with the EEOC on the basis of retaliation after she left U.S. Bell.

According to Brzycki, sexual harassment complaints that were received were investigated. In direct contrast to Brzycki's claim, Bernard remembers female employees making complaints to the management about Norvil and never hearing a response back. Cripe testified that Kurtis was aware of Norvil's behavior before the EEOC was contacted and that Kurtis "was doing nothing to punish Mike in the way he should have been punished." *Id*. at 153. Daniels noted that "whenever [female employees] tried to say anything to the owner, Keanan, nothing would get done." Pl. Br., Exh. 13, p. 21 (Daniels Dep.). In a memo dated March 19, 2002, Brzycki wrote that

> [Norvil] had been written up by staff leaving the company on many occasions with no ramifications from his senior Keanan Kintzel. Keanan was made aware of the reports by me and took the point of view that because we had staff members sign the EEOC policy letter we were safe. We had spoken to Mike several times about his behavior concerning women in the office and he promised us that nothing further would occur. We did not take into account the effect that Mike's behavior was having on the staff.

Pl. Br., Exh.10, Dep. Exh. 28 (Brzycki Dep.).

Kurtis believes the first complaint of Norvil's behavior he received was from Sims in March of 2002, and Kurtis claims that, once he learned of the complaints, he conducted a more thorough investigation than those undertaken by Cripe or Brzycki. On March 13, 2002, in response to Sims' complaint, Kurtis requested that the employees make reports if they had problems with Norvil. Subsequently, a group of telemarketers, including Sims, Johnson, and Roby, filed reports about Norvil. After the reports were filed, Kurtis read them one by one with Norvil and testified in his deposition that Norvil seemed surprised and stunned by all of the allegations.

Once the charges of discrimination were filed with the EEOC, Kurtis and Keenan came into her office to review employment files of the employees who filed the complaints in order to "to plot against the women." *Id*. at 137. Cripe commented that Kurtis and Keenan "were always trying to cover for Mike or make excuses for Mike." *Id*.

In addition to meeting with Norvil, Kurtis also met with Brzycki to discuss the complaints and determine what discipline should be meted out. Brzycki noted in his deposition that, though he could not remember the specifics of each report, he did notice a pattern. In response to Kurtis, Brzycki recommended that Norvil be kept out of the building until the claims could be investigated. Brzycki told Kurtis that Norvil should be terminated because of the number of complaints and the constant trouble Norvil caused, and Kurtis agreed. Further, Brzycki stated in his deposition that U.S. Bell "kind of anticipated that we may have more trouble, but we just–we weren't sure how to deal with it." D. Br., Exh. 24, p.82 (Brzycki Dep.).

Despite Brzycki's recommendation of termination, Kurtis suspended Norvil indefinitely on March 18, 2002. In the same memorandum, Brzycki was relieved of his ethics duties due to his inability, in Kurtis' opinion, to handle the situation concerning Norvil's behavior with female employees, and Cripe, Kathy Olive–the Sales Trainer, and Joshua Childs–Director of Sales Services, were warned for accepting and holding a post, but not performing its duties.

In his deposition, Kurtis testified that Norvil's suspension included a requirement that Norvil take an ethics course, labor-intensive duties away from the sales office such as groundskeeping, a reduction of pay, and meeting with the women who had made the reports to attempt to rectify the situations. Cripe noted that Norvil was on the sales floor and in the building during his suspension. On April 3, 2002, Kurtis wrote Norvil a note asking that he stay in the administration section of the

building or outside because the "reps" were unsatisfied with his presence. Norvil's suspension ended and he was reinstated in or about June of 2002.

According to Hogan and Bernard, Norvil's return made them uncomfortable as Norvil's behavior did not change after the suspension. Roby noted that she was humiliated and stressed when Norvil was allowed back on the sales floor after she had complained of his behavior. On the day of Norvil's return, Roby left work early due to chest pains, which continued for the next two days. Bernard also noted that she was ill at ease with Norvil's return to work after his suspension and had to leave work early because she was so uncomfortable. Cripe resigned her position once Norvil was reinstated because she "was tired of dealing with everything to do with Mike and nothing being done about it." Pl. Br., Exh. 11, p. 132 (Cripe Dep.). Further, once Norvil returned, Person recognized that he acted in a manner expressing that "no matter what we told Kurtis, he was still going to be Vice President of Expansion." *Id*. at 52. His coming back was like a "smack in the face" to Person and other employees. *Id*.

## DISCUSSION

In its Complaint, the EEOC alleges that U.S. Bell engaged in sexual harassment in violation of Title VII of the Civil Rights Act of 1964. This broad claim of sexual harassment includes the allegations that a class of U.S. Bell employees was subjected by their employer to a hostile work environment, quid pro quo sexual harassment, retaliation, and constructive discharge. U.S. Bell filed a Motion for Summary Judgment on all of the EEOC's claims and asserts that the evidence put forward by the EEOC does not rise to the level of actionable Title VII sexual harassment. U.S. Bell also maintains that, even if the EEOC can prevail on its claims, the *Ellerth/Faragher* affirmative defense would defeat those claims. U.S. Bell has not moved for summary judgment on the claims

of the individual Intervenor Plaintiffs, nor have the Individual Defendants joined in U.S. Bell's Motion for Summary Judgment. The EEOC responds that the evidence does rise to the level of an actionable hostile work environment, that U.S. Bell has waived its right to assert the affirmative defense, and that, even if the Court considers the affirmative defense, U.S. Bell is not entitled to its protection. The Court will address each claim in turn.

## A. Hostile Work Environment Claim

Title VII of the Civil Rights Act of 1964 forbids an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment that creates a hostile work environment is actionable under Title VII because "the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's broad rule of workplace equality." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Through Title VII, Congress sought to strike at the complete spectrum of disparate treatment based on sex in the workplace. *Id.* at 21.

In order to survive summary judgment based on a hostile work environment claim, the EEOC must demonstrate: (1) the employee was subjected to unwelcome harassment, (2) the harassment was directed at her because of her sex, (3) the conduct was so severe or pervasive as to alter the conditions of her employment, and (4) there is a basis for employer liability. *See Kriescher v. Fox Hills Golf Resort and Conference Ctr., FHR, Inc.*, 384 F.3d 912, 915 (7th Cir. 2004); *Quantock v. Shared Mktg. Servs.*, 312 F.3d 899, 903 (7th Cir. 2002); *see also Meritor Sav. Bank, FSB, v. Vinson*, 477 U.S. 57, 67 (1986) (severe or pervasive). A hostile work environment is one that is both objectively and subjectively offensive. *See Quantock*, 312 F.3d at 903.

18

The first two prongs of the hostile work environment analysis are easily met by the EEOC. The first prong demands that the harassment be unwelcome by the victims. "[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact . . . ." *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993) (citing *Meritor*, 477 U.S. at 68). Although some of Norvil's sexual interaction with employees was consensual, the evidence presented by both parties in this case demonstrates that other female employees were humiliated and made uncomfortable by Norvil's nonconsensual behavior. Several female employees, including Daniels, Lacefield, Roby, Johnson, Magana, Person, Cotton and Scott claimed they disliked Norvil touching them, commenting on their bodies, and jiggling their chairs to see their breasts move. Johnson, Cotton, Bernard, and Hogan testified that his jokes and comments were unwelcome. Magana and Cotton both told Norvil to stop touching them, and Magana gave Norvil a look that conveyed her discomfort. Norvil made comments about the women such as "You look like a slut today," and he called the female employees "dirty, skank, whore, slut, and Bs." Furthermore, the female employees, such as Sims, Reillo, Bernard, Roby, Johnson, Phillips, and Magana repeatedly turned down Norvil's requests for dates or his propositions for sex, demonstrating that these advances were not welcome. Finally, a number of the women, including Magana, Idisr, Person, Lacefield, Erwin, and Sims, complained to U.S. Bell management–Cripe, Keanan, and Brzycki–and other co-workers about Norvil's constant barrage of sexual comments and touching. From the evidence of how the employees responded to Norvil's behavior, a reasonable jury could find that the female employees of U.S. Bell did not welcome or invite Norvil's conduct.

The second prong requires that the harassment be based on the sex of the employee. Plaintiffs must prove more than that the supervisor treated everyone poorly; rather plaintiffs must

make a showing that they were targeted because of their sex. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004). Not all comments with sexual content or connotation are actionable; rather, "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Whereas female employees at U.S. Bell had their shoulders repeatedly rubbed, had their chairs tipped, and were the recipients of sexual propositions, the male employees were not subjected to this behavior. As noted by Magana, Norvil would not rub the shoulders of male employees, nor were male employees subjected to sexual advances. Based on Scott's testimony, male employees were not written up by Norvil in ways that seemed unfair and unwarranted. Based on this evidence, a reasonable jury could conclude that female employees were targeted by Norvil for sexual comments, touching, and sexual propositions because of the employees' sex.

To analyze the severe or pervasive nature of the harassment, which constitutes the third prong of this test for hostile work environment, both a subjective and objective inquiry is necessary.[6] The subjective inquiry compels the court to ask whether the victims subjectively perceived the

---

[6] A line of cases in the Seventh Circuit seemingly requires a determination that the hostile work environment seriously affect the psychological well-being of the plaintiff. *See, e.g.*, *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902 (7th Cir. 2005) (including in the third prong of the hostile work environment test a requirement of psychological injury); *McPherson v. City of Waukegan*, 379 F.3d 430, 437-38 (7th Cir. 2004) (same); *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) (same); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002) (same); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (same); *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993) (same); *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1238 (7th Cir. 1989) (same). However, the United States Supreme Court explicitly held that, as long as an employee subjectively perceived the workplace to be hostile, it would be enough to prevail without a showing of psychological harm. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). In accordance with this precedent, another line of Seventh Circuit cases does not require proof of psychological injury. *See, e.g.*, *Kriescher v. Fox Hills Golf Resort*, 384 F.3d 912, 915 (7th Cir. 2004) (making no mention of a requirement to prove the plaintiff was psychologically injured); *McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir. 2004) (same); *Wyninger*, 361 F.3d at 975 (same); *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (same); *Saxton v. American Tel. and Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (recognizing that the Supreme Court "has now made clear that the plaintiff need not prove that she was psychologically injured"). Accordingly, the Court will follow the holding in *Harris* and will not require the EEOC to make a showing of psychological injury to demonstrate that the harassment was severe or pervasive.

environment to be abusive such that it altered the conditions of their employment.  *See Harris*, 510 U.S. at  21-22 (1993); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000).

As for the subjective inquiry, the record reflects that a number of the women subjectively perceived the workplace as hostile based on Norvil's sexual harassment.  The evidence provided by both parties shows that many female employees personally felt humiliated, uncomfortable, and offended by Norvil's conduct.  In fact, some female employees left their employment to escape Norvil's conduct.  Others complained about his behavior to each other and U.S. Bell management.  When Norvil returned from his suspension, Hogan, Roby, Bernard, Person, and Cripe felt uncomfortable about his return and were concerned by the lack of change in his behavior.  In the extreme, Roby noted that she had chest pains and was humiliated, which required her to leave work early that day.  Also, upon Norvil's return, some women resigned rather than continue to deal with Norvil.  Subjectively, the evidence demonstrates that the female employees of U.S. Bell felt that their workplace was a hostile work environment when Norvil was in charge.

Turning to the objective inquiry, the Court must query whether a reasonable person in the plaintiff's position, considering all of the circumstances, would find the environment hostile.  *See Harris*, 510 U.S. at  21 (1993); *see also Hostetler*, 218 F.3d at 807 (citing *Oncale*, 523 U.S. at 81).  When considering all the circumstances, the Court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23; *Russell v. Bd. of Trustees of the Univ. of Ill.*, 243 F.3d 336, 343 (7th Cir. 2001); *Hostetler*, 218 F.3d at 806-07.  The Seventh Circuit has determined that "[i]solated and/or trivial remarks of a sexual nature do not satisfy the definition of sexual harassment: the offensive conduct

must be persistent." *Rennie*, 3 F.3d at 1107 (internal quotations marks omitted) (alteration in original).

A hostile work environment is defined by the Seventh Circuit as "hellish." *Id*. "When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance." *Hostetler*, 218 F.3d at 807. Second-hand harassment, although not given as much weight as direct harassment, is relevant to the hostile work environment inquiry. *See Hildebrandt v. Illinois Dept. of Natural Res.*, 347 F.3d 1014, 1035 (7th Cir. 2003) (holding that second-hand harassment, that is, comments not directed to the plaintiff, do not have the same impact as harassment directed at the plaintiff); *Patt v. Family Health Sys.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that second-hand harassment claims are relevant to the plaintiff's claim).

There is no "mathematically precise" test to determine a hostile work environment as it is a fact-intensive inquiry. *Robinson v. Sappinton*, 351 F.3d 317, 329 (7th Cir. 2003). Analyzing a hostile work environment claim is often a very difficult process as there is no bright line test. *See, e.g., Kriescher*, 384 F.3d at 912 (summary judgment is appropriate because the employee was not subjected to unwanted physical contact nor were disparaging comments directed at her); *Robinson*, 351 F.3d at 317 (noting that the defendant made several sexually overt comments, took inappropriate interest in plaintiff's dating life, made gestures "that when put in the larger context, served as a constant reminder of [his] interest in her, sexually suggestive incidents occurred on an almost weekly basis and that "she could not avoid personal conduct and still do her job"); *Patt*, 280 F.3d at 749 (summary judgement was affirmed as eight comments over the course of employment were too sporadic to be severe or pervasive); *Hostetler*, 218 F.3d at 812 (reversing summary judgment because

a reasonable person could find that a forcible kiss, unfastening a female employee's bra, and describing his effective oral sex technique created a hostile work environment); *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998) (holding that scattered and offhand statements were not enough to create a hostile work environment).  As the Seventh Circuit noted in *Baskerville v. Culligan*:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures.  On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse and boorish workers . . . .  It is not a bright line, obviously, this line between a merely unpleasant working environment on one hand and a hostile or deeply repugnant one on the other . . . ."

50 F.3d 428, 430 (7th Cir. 1995) (internal citations omitted).

The Court finds that a reasonable person in the position of the female employees at U.S. Bell could find that their workplace was hostile and abusive.  *See Harris*, 510 U.S. at 21-22.  This case encompasses more than a few off-hand comments with sexual connotations.  Much of Norvil's actions fall on the side of the line that divides abusive behavior from that which is merely vulgar or mildly offensive.  Norvil exposed himself to Roby and sucked on her fingers.  He also rubbed the shoulders of numerous women and touched the breasts of others.  Norvil made comments every day about how the female employees' bodies and clothing looked, he repeatedly solicited different employees for sex, and several times every week he would tip the chairs of female employees to look down their shirts.  In addition, Norvil frequently made sexual jokes, commented on his sex life, and requested dates repeatedly from the same individuals.  A reasonable person in the position of these women might find Norvil's behavior humiliating, even intimidating. Norvil also intimidated the women by making them feel that their jobs were in jeopardy if they complained about his behavior. The repeated nature of his comments and touching, combined with the solicitations of sex, created

a constant barrage that had to be endured by all of the female employees. Both the severity and frequency of the behavior could lead a reasonable person to determine a hostile work environment existed at U.S. Bell.

Several women testified that they were uncomfortable due to Norvil's invariant sexual harassment. In fact, upon Norvil's return from his suspension, many female employees testified they were humiliated and had to leave work early. This leads into the inquiry of whether the behavior unreasonably interfered with the employees' job performance. Having female employees leave work early or even resign due to the presence of Norvil unreasonably interferes with the ability to perform. Further, the employees were subjected to Norvil tipping their chairs while they tried to fulfill their telemarketer's duties.

Because the line between actionable conduct and that which is vulgar or mildly offensive is often difficult to define, it is instructive to compare Norvil's actions with those of harassers in various cases in which the Seventh Circuit has held that a reasonable person could find that the alleged conduct was severe or pervasive.

In *EEOC v. Indiana Bell Telephone Company*, the harasser's behavior included repeatedly exposing his penis to female employees, making comments with sexual connotations, making remarks about female employee's bodies, and rubbing their shoulders along with other behavior. *See EEOC v. Indiana Bell Tel. Co.*, 214 F.3d 813, 816-17 (7th Cir. 2000), *rev'd on other grounds*, 256 F.3d 516 (7th Cir. 2000). The court determined that all of the employees were disturbed by this behavior and that the alleged conduct was enough to establish both an objective and subjective hostile work environment. *Id*. at 822. The female employees at U.S. Bell were all complaining about a similar pattern of sexual harassment. Although not as frequently as the harasser in *Indiana Bell*, Norvil exposed his penis to Roby and later bragged to Johnson that Roby and Maxwell had

24

performed oral sex on him to keep their jobs. He also placed Roby's fingers in his mouth and kissed and sucked on them. Norvil directly solicited sex from the female employees and told other female employees which of their co-workers he would have sex with or who he could get. Norvil made comments about the women's clothing, underwear, breast size, panty lines, about the size of his penis, and about his desire to have sex with particular women. Norvil often rubbed the shoulders of female employees, even though the touching was unwelcome, and Norvil would tip the women's chairs back to look down their shirts and watch their breasts jiggle. As in *Indiana Bell*, the U.S. Bell female employees were disturbed and uncomfortable because of Norvil's behavior, and it is reasonable to find that U.S. Bell was both subjectively and objectively a hostile work environment.

In *Quantock v. Shared Marketing Services*, Cathey Quantock was propositioned for sex three times, all of which she refused, during a meeting by the president of the company. 312 F.3d at 902; *see also Wyninger*, 361 F.3d at 977. The Seventh Circuit held that summary judgment was inappropriate, in part, because the solicitation of sex rose to the level of actionable sexual harassment, reasoning that the direct propositions combined with the president's position of authority and the close working conditions could be viewed by a reasonable jury as hostile. *Quantock*, 312 at 902 (noting that the supervisor solicited sex "in a crude and shocking manner," which along with other actions could constitute a hostile work environment); *see also Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir. 1997) (reasoning that the "intimate office setting" of the plaintiff's small office, which contained no partitions or walls, increased her humiliation and, therefore, the severity of the discriminatory conduct). In *Quantock*, only one woman was propositioned for sex whereas at U.S. Bell, Norvil solicited several women for sex, including for threesomes and oral sex. The working conditions at U.S. Bell were open and intimate as all of the telemarketers worked in an open room where everyone could hear and see what was happening

25

around them; there was no privacy. The U.S. Bell working environment, like the close working conditions in *Quantock*, combined with the high frequence of sexual comments and propositions made by Norvil, could be viewed as leading to heightened humiliation and a hostile environment.

In *Hostetler*, the Seventh Circuit reversed the district court's grant of summary judgment for the employer when the harasser, over a two-day period, had stuck his tongue down the plaintiff's throat, attempted to kiss her, unfastened four snaps on her brassiere, said he would unfasten it completely, and stated that he could perform oral sex on her so effectively that she would do cartwheels. 218 F.3d at 808. The court held that, although there were a limited number of acts involved so that the conduct might not be pervasive, the behavior could "readily be described as a hostile working environment" because two of the acts involved physical contact of an intimate nature and that the lewd remark "was more than a casual obscenity." *Id*. at 807-08. As discussed above, Norvil's physical contact with the women was of an intimate nature and his lewd remarks were more than a casual obscenity because he was actively seeking sexual encounters with the women. Unlike in *Hostetler*, in which the conduct was limited to two acts, Norvil's conduct was also pervasive in that his comments and actions were directed at multiple women over the course of his employment.

Accordingly, the Court finds that a reasonable juror could find that the workplace at Buzz was both subjectively and objectively hostile and abusive.

Finally, the fourth prong of the sexual harassment analysis addresses the issue of employer liability. The Seventh Circuit has held that an employer can be liable, notwithstanding any affirmative defenses, if a supervisor has engaged in sexual harassment. *Rhodes*, 359 F.3d at 506. However, the plaintiff must demonstrate that the harasser was her supervisor with direct power to affect the terms and conditions of her employment. *Id*. The power to affect the terms and conditions is often considered to encompass the power to "hire, fire, promote, demote, discipline or transfer .

26

. . ." *Id*. It is not enough to show that the harasser merely had the power to oversee aspects of another employee's job. *Id*. To fulfill the fourth prong, Norvil must have been the complaining female employees' supervisor. Neither the EEOC nor U.S. Bell in their briefs challenge the assumption that Norvil was in fact a supervisor for all of the plaintiffs. Norvil could and did have the power to affect the conditions of the workplace as he personally oversaw the sales floor. Norvil had the power to discipline, to fire or at a minimum to recommend termination, and to recommend hiring. Accordingly, there is a basis for employer liability.

Based on the foregoing analysis of the four-part test for hostile work environment, the Court finds that a reasonable jury could determine that Norvil's behavior created such conditions at U.S. Bell so as to create a hostile work environment in violation of Title VII.

## C. *Ellerth/Faragher* Affirmative Defense

In the Motion for Summary Judgment, U.S. Bell argues that, if the Court finds that the EEOC has met its burden of demonstrating a hostile work environment, U.S. Bell should nevertheless be granted summary judgment because it can establish the affirmative defense set forth in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998). The EEOC argues that U.S. Bell waived the affirmative defense by failing to assert it in its answer and that, even if U.S. Bell had properly raised the defense, it is not entitled to rely on the defense.

*1. Waiver*

Federal Rule of Civil Procedure 8(c) requires that a defendant, in a responsive pleading, raise all affirmative defenses that will defeat the allegations in the complaint. *See* Fed. R. Civ. P. 8(c); *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004). The purpose of this Rule is to "avoid surprise and undue prejudice to the plaintiff by providing her notice" and an opportunity to respond. *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997). If a defendant does not raise a defense at the time of filing an answer, the defense is deemed waived. *Castro*, 350 F.3d at 735; *Johnson v. Sullivan*, 922 F.2d 346, 355 (7th Cir. 1990); *Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 (7th Cir. 1981). A defendant may seek leave to amend an answer to assert an affirmative defense once the availability of an affirmative defense is reasonably apparent, but the defendant must alert the parties and the court of the intent to pursue that defense. *Venters*, 123 F.3d at 967. A failure to amend the answer raises the risk that the court will find the defense to have been waived. *Id*. at 967-68. However, a defendant may be allowed to raise an affirmative defense late in the proceedings if the plaintiff is not prejudiced by the late notice and has an opportunity to respond. *See Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005).

In *Venters v. City of Delphi*, the Seventh Circuit held that an affirmative defense raised in the reply brief in support of a motion for summary judgment was deemed waived when the defense was not raised in the answer and no amended answer had been filed. *Venters*, 123 F.3d at 968. The court reasoned that "if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff." *Id*. at 969. The court focused on the defendant's failure to assert the defense even though the parties had endured a long discovery process, the plaintiff did not have an opportunity to respond, and the scheduled trial date was in a month. *Id*. at 968.

In contrast, in *Williams v. Lampe*, the Seventh Circuit allowed a defendant to assert an affirmative defense even though the defendant failed to properly plead the affirmative defense. 399 F.3d at 871. Reasoning that the plaintiff was given an opportunity to respond to the late affirmative defense, unlike the plaintiff in *Venters*, the court held the plaintiff was not prejudiced by the late notice. *Id.* The court further held that a plaintiff, after an opportunity to respond to the defense, "cannot establish prejudice merely by showing that the case has progressed significantly since the defendant answered [the] complaint." *Id.*

Although U.S. Bell had ample opportunity and notice that the affirmative defense was available, U.S. Bell nevertheless failed to follow the Federal Rules of Civil Procedure and properly amend the Answer. U.S. Bell's first assertion of the defense was in the Motion for Summary Judgment. As in *Williams*, and unlike in *Venters*, the EEOC had an opportunity to respond to the affirmative defense raised by U.S. Bell in the motion for summary judgment and the EEOC did so in its opposition brief. The EEOC has not made any showing that it was prejudiced in its ability to respond to the late-asserted affirmative defense, such as an inability to conduct relevant discovery. Therefore, the Court will allow U.S. Bell to assert the affirmative defense, and the Court will consider the defense on the merits.

*2. The Defense*

When no tangible employment action has been taken by the employer against the employee, an employer is entitled to assert the *Ellerth/Faragher* affirmative defense, which encompasses two elements: (1) that the employer had "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2346 (2004) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)). In *Suders*, the United States Supreme Court further explains that the employee "who alleges no tangible employment action has the duty to mitigate harm." 124 S. Ct. at 2346. However, it is the defendant's burden to "prove the plaintiff unreasonably failed to avoid or reduce harm." *Id*. at 2354.

An exception to the defense is recognized by the Seventh Circuit. An employer is not able to avoid liability if the offending employee is "within that class of an employer organization's officials who may be treated as the organization's proxy." *See Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000) (citing *Faragher*, 524 U.S. at 789).[7] The following officials may be considered an employer's proxy: "a president, owner, proprietor, partner, corporate officer or supervisor 'hold[ing]' a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" *Johnson,* 218 F.3d at 730 (quoting *Faragher*, 524 U.S. at 789-90). In *West*, although the harasser had an important title, it was not enough to find that he was a proxy for his employees. Noting that the defendant had no less than two supervisors and that the plaintiff answered to other supervisors, the court held "if automatic vicarious liability is warranted for Williams, there would be little or nothing left of the [*Ellerth/Faragher*] affirmative defense." *Id*.

Application of the exception in this case is similarly inappropriate. Norvil answered not only to the owners of U.S. Bell, Kurtis and Keanan, but he also had to discuss his behavior with Brzycki,

---

[7] Other circuits have affirmed this exception to the *Ellerth/Faragher* defense. *See, e.g., Ackel v. National Communications, Inc.*, 339 F.3d 376, 383-84 (5th Cir. 2003) (citing the Seventh Circuit decision in *Johnson v. West* and holding that an employer is vicariously liable when the "harassing employee is a proxy for the employer"); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1233 (10th Cir. 2000) (recognizing that the United States Supreme Court created an "alter ego" exception to the affirmative defense); *Dees v. Johnson Controls*, 168 F.3d 417, 421-22 (11th Cir. 1999) (noting an employer can be held vicariously liable if the supervisor holds "such a high position in the company that he could be considered the employer's 'alter ego'").

the company's Ethics Officer, and the termination of employees was processed through Cripe.[8] Despite his title as Vice President of Expansion, it does not appear that Norvil spoke for the company nor was he in a "significantly high position" within the company. *See id*. Further, if U.S. Bell would be held automatically liable for a low-level executive, the *Ellerth/Faragher* defense would be extinct in the manner against which the Seventh Circuit explicitly warned.

Although U.S. Bell did not move for summary judgment on the EEOC allegations of constructive discharge, the EEOC has not yet proven that claim. Therefore, for the purposes of analyzing the applicability of the affirmative defense, the Court will assume, without deciding, that no tangible employment action was taken by the company against the female employees.

Under the first prong of the *Ellerth/Faragher* defense, the Court must analyze whether U.S. Bell had "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. An effective sexual harassment policy "must provide for 'effective grievance mechanisms' and have a 'meaningful process' for employees to seek redress for their concerns." *Durkin v. City of Chicago*, 341 F.3d 606, 612 (2003) (citing *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001)). Although U.S. Bell "is in the best position to know what remedial procedures it offers to employees and how those procedures operate," *Suders*, 124 S.Ct. at 2354 n. 7, U.S. Bell does not provide any explanation in its brief as to how it exercised reasonable care to prevent and correct promptly any sexually harassing behavior.[9]

---

[8] Unlike the claim by the EEOC that Norvil made "all of the sales decisions, including which employees to hire and fire," it is not clear from the evidence that Norvil held these powers solely. Pl. Br., p. 28.

[9] U.S. Bell limits its argument on the affirmative defense in its opening brief to showing that none of the employees suffered a tangible employment action and that the EEOC cannot prove a hostile work environment.

U.S. Bell took few steps to prevent sexual harassment within the workplace as it had no widely disseminated sexual harassment policy. Only a few management-level employees, including Norvil, Robertson-Smith, and Cripe, remember being asked to sign a policy stating sexual harassment would not be tolerated when they began their employment. Although Brzycki wrote a sexual harassment policy, it does not appear that it was distributed to the other employees or posted within the workplace. None of the employees testified that the policy was published or placed out in view of the employees, nor were employees fully aware of complaint procedures in direct contrast to the requirements of *Durkin*. Nor did U.S. Bell conduct any sexual harassment training for its employees. There was also confusion among U.S. Bell upper management regarding who would handle the sexual harassment complaints. The reports were given or made to Cripe, Brzycki, and Robertson-Smith, but they were not always taken seriously or investigated. Sometimes Norvil would be talked to about the complaints and other times the complaints were ignored and never investigated. Further, Robertson-Smith testified that no one did anything about sexual harassment other than write reports.

The second part of the first prong demands that U.S. Bell demonstrate that they promptly corrected any sexually harassing behavior. Although U.S. Bell claims it did promptly correct Norvil's behavior and Kurtis' testimony supports his claim that he thoroughly investigated and took action against Norvil once he learned about the wide-spread nature of the complaints, there is a question of fact as to the extent of the management's knowledge prior to March 2002 and the action or inaction that followed that knowledge. Norvil notified his employers of his termination from two previous employments due to sexual harassment by placing a letter in his personnel file shortly after he began working for U.S. Bell in late 2000. Cripe, Brzycki, and Keanan then began receiving

complaints from women in 2001 regarding Norvil's behavior, as well as Sims' complaint in January 2002. Little action was taken except for the occasional meeting with Keanan or Brzycki. It is unclear from the record how early Kurtis knew of the complaints from Sims after she made them in January 2002 and what action, if any, he took with Norvil based on those complaints prior to Norvil's suspension in March 2002. It is also unclear to what extent Keanan, the secretary and treasurer, knew about the various harassments early on, as Lacefield testified that she told Keanan about the harassment in the fall of 2001, and what his role in the management of the company was.

U.S. Bell asserts that it took corrective action against Brzycki and Cripe for their failure to fully investigate complaints; however, the only tangible action taken against Norvil was a paid suspension after complaints were received from thirteen different female employees. U.S. Bell does not assert that the suspension was an adequate response to the sexual harassment. After a few months' suspension, during which time Norvil continued to work for the company and was occasionally on the telemarketing floor, Norvil was reinstated, which made the female employees uncomfortable and upset. Person testified that Norvil was "back to his old self" after the EEOC conducted its interviews at Buzz.

The second prong of the *Ellerth/Faragher* defense asks whether the employees unreasonably failed to take advantage of the policy provided by the employer or to otherwise avoid harm. *See id*. at 2347. U.S. Bell did not address this prong of the defense in its brief either, despite its burden to prove the defense. *See id*. at 2354 n. 7. From all accounts, female employees were seemingly not unreasonable when they failed to report sexual harassment. Although the women could have reported to Cripe, they were warned by Norvil not to. As the facts demonstrate, the female employees were repeatedly intimidated and threatened by Norvil so that they would not complain

about Norvil to the higher management. Norvil threatened that he would fire anyone who complained and made it clear that employees should not go over his head. There was a perception by some employees, such as Bernard, that complaints about Norvil were made and that those complaining employees were then fired or quit immediately after voicing their complaints. In addition to Norvil's intimidation, the female employees also had no faith that any action would be taken even if they did complain. Due to the intimidation and confusion, along with the lack of a readily accessible policy, a reasonable jury could find that it was not unreasonable for the employee's failure to report the sexual harassment more frequently, earlier, or to higher management.

In conclusion, the Court finds that U.S. Bell has failed to prove either prong of the *Ellerth/Faragher* defense at this stage of the litigation. Because the Court finds that a reasonable jury could determine that Norvil's actions created a hostile work environment at U.S. Bell and that U.S. Bell has failed to establish that it took steps to prevent and correct sexual harassment, summary judgment on the EEOC's hostile work environment claim is inappropriate.


**B. Quid Pro Quo Sexual Harassment, Retaliation, and Constructive Discharge Claims**

Federal Rule of Civil Procedure 56(e) provides that summary judgment should be granted, if appropriate, when the adverse party fails to respond. Fed. R. Civ. P. 56(e); *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994). Further, if issues raised in the motion for summary judgment are not responded to by the non-moving party, the issues are deemed waived. *Palmer v. Marion County,* 327 F.3d 588, 597-98 (7th Cir. 2003) (holding a plaintiff who failed to state a negligence claim in his brief in opposition to summary judgment was abandoned); *Laborers'*

*Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1996) (stating that arguments not presented to the district court in response to summary judgment motions are waived.).

In its Complaint, in addition to hostile work environment, the EEOC asserts quid pro quo sexual harassment, retaliation, and constructive discharge claims against U.S. Bell on behalf of four individuals–Tiffany Sims, Renee Roby, Joshua Childs, and Beatrice Johnson. U.S. Bell moved for summary judgment on all of the EEOC's claims with the exception of constructive discharge:

> A. The plaintiff cannot establish that Tiffany Sims, Beatrice Johnson or Renee Roby were subjected to hostile work environment sexual harassment and quid pro quo sexual harassment.
>
> B. U.S. Bell did not terminate or take any adverse job action against any employee in retaliation for making a claim of sexual discrimination or harassment.
>
> C. U.S. Bell did not engage in a pattern or practice of discrimination based on sex and retaliation.
>
> D. U.S. Bell exercised reasonable care to prevent and promptly correct workplace harassment, and the class representatives, as well as the class members, unreasonably failed to take advantage of corrective opportunities that were available.

Def. Br., p. 2. Just as the motion does not address constructive discharge, U.S. Bell's Brief in Support does not address constructive discharge either. The EEOC does reassert its claim for constructive discharge in its response brief. Therefore, any claims of constructive discharge asserted by the EEOC in its Complaint remain for trial.

However, U.S. Bell did move for summary judgment on the issues of retaliation and quid pro quo as to Tiffany Sims, Renee Roby, Joshua Childs, and Beatrice Johnson, and the EEOC did not respond to the substantive merits of these arguments. In its response, the EEOC addresses these claims by noting that U.S. Bell has settled with the intervenor plaintiffs on all of their claims and that, therefore, the quid pro quo and retaliation claims are no longer at issue in this case as to the Intervenor Plaintiffs. The EEOC does not address the retaliation and quid pro quo arguments raised

35

in its own Complaint. Therefore, it appears that the EEOC concedes that the settlement by U.S. Bell with the individuals is not only as to the Intervenor Complaint but also as to the quid pro quo and retaliation claims set forth in the EEOC's Complaint on behalf of those individuals–Tiffany Sims, Beatrice Johnson, Joshua Childs, and Renee Roby–and for whom individual relief was sought by the EEOC on the basis of retaliation and quid pro quo sexual harassment. At a minimum, by not responding to U.S. Bell's arguments, the EEOC has waived its claims of quid pro quo and retaliation, if any such claims remained after U.S. Bell's settlement with the Intervenor Plaintiffs.

Accordingly, summary judgment is granted in favor of U.S. Bell on the EEOC's quid pro quo and retaliation claims in the Complaint. Summary Judgment on the claim of constructive discharge in the EEOC's complaint has not been sought by U.S. Bell, and, therefore, the EEOC's claim of constructive discharge remains for trial.

### C. Scope of the EEOC's Complaint

In the Brief in Support of Defendants' Motion for Summary Judgment, U.S. Bell argues that this Title VII lawsuit does not contain allegations that are like or reasonably related to allegations contained in the EEOC charges filed by the individual women and that there is no nexus between the initial charges by those women and the subsequent allegations brought by the EEOC in this federal Complaint, citing *Cheek v. Western & Southern Life Insurance Co.*, 31 F.3d 497, 501 (7th Cir. 1994); *EEOC v. Caterpillar, Inc.*, 336 F. Supp. 2d 858, 863-64 (N.D. Ill. 2004); *EEOC v. Jillian's of Indianapolis, Indiana, Inc.*, 279 F. Supp. 2d 974, 979 (S.D. Ind. 2003). It appears that U.S. Bell is arguing that the EEOC's Complaint should be dismissed for a failure to have exhausted administrative remedies.

However, as argued by the EEOC, a lawsuit "brought by the EEOC is not limited to discriminations that the charging party had standing to raise." *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 819 n. 6 (7th Cir. 1990) (internal quotation marks and citation omitted). The EEOC may allege in its Complaint whatever unlawful conduct it uncovers during the course of its investigation, "provided there is a reasonable nexus between the initial charge and the subsequent allegations in the complaint." *EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 968 (7th Cir. 1996). First, it appears that all of the allegations brought in the EEOC's Complaint arose directly out of the investigation commenced after the filing of EEOC charges by various employees. Second, there is a reasonable nexus between the charges filed by the individual female employees and the subsequent allegations in the EEOC Complaint as both deal solely with the alleged conduct of Norvil.

## CONCLUSION

Based on the foregoing, the Court now hereby **GRANTS in part** and **DENIES in part** the Defendant's Motion for Summary Judgment [DE 142]. The Court **GRANTS** the Defendants' Motion for Summary Judgment on the claims of quid pro quo sexual harassment and retaliation. The Court **DENIES** the Motion for Summary Judgment on the claim of hostile work environment. Summary Judgment was not sought on the claim of constructive discharge and remains for trial.

The Court **REAFFIRMS** the Trial Setting of **August 15, 2005** and the Final Pretrial Conference set for **August 4, 2005, at 9:00 a.m.**

So ORDERED this 19th day of July, 2005.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record